**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**April 2, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

—————

No. 01-60894

—————

CITY OF ABILENE,

Petitioner,

versus

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

_____

Case No. 01-60895

CITY OF IRVING,

Petitioner,

versus

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

Before HIGGINBOTHAM, EMILIO M. GARZA, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The Cities of Abilene and Irving, Texas ("Cities") petition this Court for review of permits issued by the Environmental Protection Agency ("EPA") imposing certain conditions on the Cities' ability to discharge pollutants from their storm sewer systems into United States waters. The challenged permit conditions require the Cities to implement a variety of programs designed to prevent the introduction of pollutants into storm sewers. The Cities contend that the EPA lacks the statutory authority to impose these conditions insofar as they require the Cities to regulate their residents according to federal standards. In the alternative, the Cities argue that the permits violate the Tenth Amendment to the United States Constitution by compelling them to administer a federal regulatory scheme. The Cities also contend that the public education requirements in their permits violate the First Amendment by compelling them to convey the EPA's message regarding the proper disposal of pollutants. Finally, the Cities argue that the permits are arbitrary and capricious. Because the record before us does not support these contentions, we deny the petitions for review.

I

"The Clean Water Act anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (quoting 33 U.S.C. § 1251(a)). Under the Act, an entity seeking to discharge pollutants into the

waters of the United States must obtain a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342(a). NPDES permits generally impose numeric effluent limitations on the discharge of pollutants. 33 U.S.C. §§ 1311(b), 1342(a); *see also* 33 U.S.C. § 1362(11) (defining "effluent limitation" as "any restriction . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean. . . ."). An NPDES permit requiring the permittee to meet specific effluent limitations measured at the point of discharge is referred to as a "numeric end-of-pipe permit."

Because storm water inevitably contains pollutants such as sand or cellar dirt, 33 U.S.C. § 1362(6), an NPDES permit is required for the discharge of certain types of storm water into the waters of the United States. Permits for municipal and industrial storm water discharges are governed by 33 U.S.C. § 1342(p) and 40 C.F.R. § 122.26. While permits for discharges of storm water associated with industrial activity must impose effluent limitations, § 1342(p) authorizes the EPA to issue permits for discharges from municipal separate storm sewer systems ("MS4s") that effectively prohibit the introduction of non-storm water into the MS4 and establish management practices and other methods "to reduce the discharge of pollutants to the maximum extent practicable." 33 U.S.C. § 1342(p)(3). This more flexible type of permit is referred to as a "management permit."

The Cities, which have populations between 100,000 and 250,000, operate "medium" MS4s, 40 C.F.R. § 122.26(b)(7)(i), and were required to participate in the two-phase permit application process under 40 C.F.R. § 122.26(d). During the second phase of this process, the Cities were required to submit proposed storm water management programs ("SWMPs") describing how they

would reduce the discharge of pollutants. 40 C.F.R. § 122.26(d)(2)(iv) ("Proposed [SWMPs] will be considered by the Director when developing permit conditions. . . ."). The Cities and the EPA negotiated the terms of the SWMPs, and the EPA eventually presented the Cities with proposed management permits containing the challenged conditions. These conditions required the Cities to develop, implement, and enforce programs to prevent the discharge of pollutants into their MS4s from a variety of sources, including areas undergoing development, construction sites, sanitary sewers, landfills, hazardous waste treatment facilities, and certain industrial facilities. The conditions also required the Cities to prevent the discharge of motor oil, household wastes, and various agricultural products into MS4s and to implement a public education program promoting proper disposal of pollutants.

The Cities filed comments objecting to these conditions, and negotiations continued until the EPA offered the Cities the option of pursuing numeric end-of-pipe permits, which would have required the Cities to satisfy specific effluent limitations rather than implement management programs. The Cities declined this offer, electing to continue negotiations on the management permits. The Cities subsequently submitted revised SWMPs, which were incorporated into the conditions of the final permits. After the Cities' requests for relief were denied by the EPA's Environmental Appeals Board, they petitioned this Court for consolidated review.

II

The Cities challenge their permits on both statutory and constitutional grounds. "[F]ederal courts have a . . . duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration." *ACORN v. Edwards*, 81 F.3d 1387, 1390-91 (5th Cir. 1996) (quoting *County Court of Ulster County v. Allen*, 442 U.S. 140, 154 (1979)

-4-

(internal brackets omitted)).  Accordingly, we consider the Cities' statutory challenge first.

The Cities contend that 33 U.S.C. § 1342(p) does not grant the EPA the authority to require a State or locality to regulate its residents as a condition of receiving a storm water discharge permit. They further contend that the EPA's interpretation of § 1342(p) is not entitled to deference under *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), because that interpretation "invokes the outer limits of [federal] power." *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001).  Section 1342(p) provides, in relevant part, that MS4 discharge permits "shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers" and "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and *such other provisions as the Administrator . . . determines appropriate for the control of such pollutants*."  33 U.S.C. § 1342(p)(3)(B) (emphasis added).  The plain language of § 1342(p) clearly confers broad discretion on the EPA to impose pollution control requirements when issuing NPDES permits.  *See Arkansas*, 503 U.S. at 105 ("Congress has vested in the [EPA] broad discretion to establish conditions for NPDES permits."); *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999) ("Under 33 U.S.C. § 1342(p)(3)(B)(iii), the EPA's choice to include either management practices or numeric limitations in [NPDES] permits [for MS4s] was within its discretion.").[1]  Thus, even if *Chevron* deference is not warranted, the challenged

---

[1] For the first time in a footnote in their reply brief, the Cities suggest that the EPA *may* lack the statutory authority to issue numeric end-of-pipe permits for MS4s, although they expressly disclaim any intent to take a position on this question on the grounds that the EPA did not issue them this type of permit.  To the extent that the Cities present any argument on this question, that argument is waived.  *See In re Liljeberg Enters., Inc.*, 304 F.3d 410, 427 n.29 (5th Cir. 2002) ("Ordinarily, we do not consider arguments raised for the first time in a reply brief.").

permit conditions are within the EPA's discretion.

## III

The Cities do not contend that 33 U.S.C. § 1342(p) or 40 C.F.R. § 122.26(d) are, by their own terms, unconstitutional. The Cities concede that, under the Commerce Clause, Congress may directly regulate the discharge of storm water into United States waters. The Cities have instead brought an as-applied challenge, arguing that their permits violate the Tenth Amendment by requiring them to regulate third parties within their boundaries according to federal standards.[2]

The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. Although "the text of the Tenth Amendment . . . is essentially a tautology," it nevertheless "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 156-57 (1992). The Supreme Court has held that, under the Tenth Amendment, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997); *see New York*, 505 U.S. at 161 ("Congress may not simply 'commandee[r] the legislative processes of the States by directly

---

[2] The Ninth Circuit recently addressed a similar Tenth Amendment challenge to the EPA's permitting regulations for storm water discharges from small MS4s. *Environmental Def. Ctr., Inc. v. EPA*, 319 F.3d 398 (9th Cir. 2003). Those regulations impose a variety of conditions on permittees, requiring them to, *inter alia*, "prohibit non-stormwater discharges to the MS4 and implement appropriate enforcement procedures." *Id*. at 410. The Ninth Circuit concluded that these requirements did not violate the Tenth Amendment because municipalities have the option of not discharging into United States waters or of seeking a permit under the regulations for large and medium MS4s, which "can be satisfied without obligating the operator . . . to regulate anyone." *Id*. at 414-19. As discussed below, the facts of the individual permitting processes at issue in this case obviate the need to reach these larger questions.

compelling them to enact and enforce a federal regulatory program." (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)).  This protection extends to local governments such as the Cities.  *See Printz*, 521 U.S. at 931 n.15 (refusing to apply the Eleventh Amendment distinction between States and municipalities to "the question of whether a governmental entity is protected by the Constitution's guarantees of federalism, including the Tenth Amendment"); *West v. Anne Arundel County, Md.*, 137 F.3d 752, 758 n.2 (4th Cir. 1998) ("For purposes of determining whether a governmental entity is protected by constitutional guarantees of federalism, including the Tenth Amendment, the law does not distinguish between states and their political subdivisions.").

The Federal Government may, however, *persuade* States and localities to implement federal regulatory programs so long as the choice of whether or not to comply lies with the residents of the State or locality acting through their respective governments.  *See New York*, 505 U.S. at 168 ("[Under] any . . . permissible method of encouraging a State to conform to federal policy choices, the residents of the State retain the ultimate decision as to whether or not the State will comply.").  When the Federal Government offers such a choice, the alternative to implementing the federal regulatory program must not unduly infringe on the sovereignty of the State or local government.  *Id.* at 176 ("A choice between two unconstitutionally coercive regulatory techniques is no choice at all.").  Nevertheless, if the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise unappealing is insufficient to establish a Tenth Amendment violation.  *See Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 766 (1982) ("[I]t cannot be constitutionally determinative that the federal regulation is likely to move the States to act in a given way, or even

to coerce the States into assuming a regulatory role. . . ." (quoting *Hodel*, 452 U.S. at 289 (internal quotation marks and brackets omitted))).[3]

Even assuming *arguendo* that the Cities' storm water discharge permits require them to implement a federal regulatory program, the Cities cannot establish a Tenth Amendment violation without demonstrating that they had no other option but to regulate according to federal standards. Here, the Cities were offered a choice between the permits at issue, which require implementation of the challenged management programs, and the numeric end-of-pipe permits, which would have required compliance with rigid effluent limitations. The Cities chose the former. Thus, the Cities' Tenth Amendment challenge fails unless the alternative numeric end-of-pipe permits presented by the EPA would also have exceeded the Federal Government's authority under the Constitution.[4]

In light of the Supreme Court's decision in *Reno v. Condon*, 528 U.S. 141 (2000), we

---

[3] The distinction between persuasion and compulsion is illustrated by the Supreme Court's treatment of three provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985, Pub. L. No. 99-240, 99 Stat. 1842. *Compare New York*, 505 U.S. at 171-73 (upholding incentives conditioning States' receipt of federal funds on attainment of legislative and regulatory milestones because States could choose whether or not to accept the conditional federal grant), *and id.* at 173-74 (upholding incentives offering States the choice of either regulating the disposal of radioactive waste according to federal standards or having state law preempted by federal regulation), *with id.* at 174-77 (striking down incentives offering States the choice of either regulating according to federal standards or taking title to their radioactive waste because "[e]ither way, 'the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program'" (quoting *Hodel*, 452 U.S. at 288)).

[4] The Cities contend that they were not presented with a real choice because the EPA never intended to issue numeric end-of-pipe permits for their MS4s and the offer was merely an attempt to coerce them into accepting the management permits. The Cities assert that the EPA lacks the ability to set numeric effluent limitations for most MS4s and note that the alternative permits were not offered until late in the permitting process and did not set specific limitations. Although the EPA concedes that numeric end-of-pipe permits are not the most efficient or effective way of regulating MS4s, the record does not demonstrate that the EPA would not or could not have issued numeric end-of-pipe permits with specific effluent limitations if the Cities had elected to pursue that option.

conclude that the alternative numeric end-of-pipe permits do not offend the Tenth Amendment. In *Condon*, the Supreme Court held that the Federal Government may "regulate[ ] state activities" so long as it does not "seek[ ] to control or influence the manner in which States regulate private parties." *Id*. at 150 (quoting *South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988)). The Court upheld the constitutionality of the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721-2725 ("DPPA"), which restricted the ability of States to disclose the personal information in their motor vehicle databases without the driver's consent. *Id*. at 143-44. The Court concluded that the DPPA did not violate the Tenth Amendment because it "[did] not require the States in their sovereign capacity to regulate their own citizens." *Id*. at 151. Instead, "[t]he DPPA regulate[d] the States as the owners of data bases." *Id*. The Court also held that, because the DPPA's regulation of state activity was constitutional, the fact that compliance with the statute required legislative or administrative action on the part of the States was immaterial. *Condon*, 528 U.S. at 150-51 ("Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." (quoting *Baker*, 485 U.S. at 514-15)).[5]

Like the DPPA, the proposed numeric end-of-pipe permits would not have required the Cities

---

[5] For this reason, the fact that the Cities may be required to undertake legislative or regulatory action to implement the conditions of their permits does not, by itself, establish a Tenth Amendment violation. Nor, taken alone, are the conditions prohibiting the Cities from taking any action in conflict with the permits sufficient to violate the Constitution. In order for their Tenth Amendment challenge to succeed, the Cities must demonstrate that they had no choice but to accept these conditions. *See Koog v. United States*, 79 F.3d 452, 457 (5th Cir. 1996) ("[T]he touchstone of . . . impermissible coercion is whether the States are precluded from rejecting the role envisioned for them by the federal government.").

to regulate their own residents but instead, by requiring the Cities to meet effluent limitations, would have regulated them in the same manner as other dischargers of pollutants. Because the record shows that the Cities voluntarily chose the management permits over permits that did not require the Cities to regulate according to federal standards, the Cities have not been compelled to implement a federal regulatory scheme. Accordingly, their Tenth Amendment challenge fails.

IV

The Cities also challenge their permits on First Amendment grounds, arguing that the public education provisions compel them to deliver the EPA's message regarding illicit discharges into MS4s and proper disposal of used motor vehicle oil, household hazardous wastes, and agricultural products. It is well established that, "[j]ust as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views. . . ." *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) (citations omitted). As discussed above, however, the Cities have not been compelled to implement the conditions of their permits. Instead, the Cities voluntarily chose permits that contained public education requirements over permits that did not. Indeed, the specific requirements of the public education programs were proposed by the Cities in their SWMPs and were then incorporated into the permits. Thus, the Cities' permits do not violate the First Amendment.

V

The Cities next challenge their permits under § 706 of the Administrative Procedure Act ("APA"), which empowers courts to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "APA arbitrary and capricious review is narrow and deferential, requiring only that the agency 'articulate a rational

-10-

relationship between the facts found and the choice made.'" *Alenco Communications, Inc. v. FCC*, 201 F.3d 608, 619-20 (5th Cir. 2000) (quoting *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994) (internal brackets omitted)). "Under this deferential standard, the Court may not substitute its own judgment for that of the agency." *Texas Oil & Gas Assoc. v. EPA*, 161 F.3d 923, 933-34 (5th Cir. 1998). "If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Id*. at 934.

The Cities contend that their permits are arbitrary and capricious because they authorize the discharge of some, but not all, pollutants. This argument is surprising given the Clean Water Act's prohibition on the discharge of *any* pollutant into United States waters without a permit. *See Texas Mun. Power Agency v. Administrator of EPA*, 836 F.2d 1482, 1488 (5th. Cir. 1988) ("The [Clean Water Act] is strong medicine. [33 U.S.C. § 1311(a)] prohibits the discharge by any person of any pollutant into the nation's waters except that which the EPA expressly allows in an NPDES permit."). Nevertheless, the Cities contend that their permits are irrational because pollutants discharged by third parties will inevitably enter their storm sewer systems and, by not issuing a permit allowing the discharge of these pollutants, the EPA has effectively forced them to violate the Clean Water Act. The Cities' argument is foreclosed, however, by the conclusion of the Environmental Appeals Board that, because the Cities' permits expressly provide that liability for third-party discharges is not transferred to the permittee, the Cities are not liable for such discharges so long as they comply with their SWMPs. This interpretation is rational and is entitled to deference.

The Cities also challenge the provisions in their permits requiring them to ensure that they have legal authority to implement the permit conditions. The Cities argue that this requirement is irrational because, as local governments, they cannot control their own legal authority. As home-rule

municipalities chartered under the Texas Constitution, however, the Cities enjoy a considerable degree of self-governance. *See Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998) ("A home rule city derives its power not from the Legislature but from Article XI, Section 5 of the Texas Constitution. . . . [I]t is necessary to look to the acts of the legislature not for grants of power to such cities but only for limitations on their powers." (quoting *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 643 (Tex. 1975))). Moreover, the Cities do not contend that they currently lack the authority to implement the permits or that any Texas statute precludes implementation. Accordingly, this requirement is not arbitrary and capricious.

For the foregoing reasons, the petitions for review are DENIED.