United States Court of Appeals
Fifth Circuit

**F I L E D**

September 8, 2004

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 02-60991

LOUISIANA ENVIRONMENTAL ACTION NETWORK,

Petitioner,

versus

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY and MICHAEL O. LEAVITT, Administrator,
United States Environmental Protection Agency,

Respondents.

Petition for Review of an Order of the
Environmental Protection Agency

Before BARKSDALE, EMILIO M. GARZA, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The Louisiana Environmental Action Network ("LEAN") petitions for review of several final

rules by the Environmental Protection Agency ("EPA"), pursuant to the Clean Air Act ("CAA" or

"the Act"), 42 U.S.C. § 7401, et seq., approving revisions to the state implementation plans for ozone

in the Baton Rouge, Louisiana area. Previously, in Sierra Club v. EPA, 314 F.3d 735, 741 (5th Cir.

2002), we held that EPA's allowance of an attainment deadline extension for a nonattainment area subverts the plain meaning of the CAA.

Arising out of the shadows of our ruling in Sierra Club, LEAN presently asserts that the EPA erroneously approved Louisiana's revised state implementation plan, as consistent with the CAA, based on criteria relevant only under the now defunct extension policy. LEAN therefore challenges, as arbitrary and capricious, the EPA's decision to approve Louisiana's revised state implementation plan attainment demonstration and Louisiana's inter-precursor trading provision. LEAN presents a separate challenge to the EPA's approval of Louisiana's substitute contingency measure consisting of emission reductions occurring outside the Baton Rouge area. For the following reasons, we deny the petition in part, and grant it in part, and remand to the EPA for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

A.    **Regulatory Background**

The CAA, first enacted in 1970 and extensively revised in 1977 and 1990, establishes a complex and comprehensive regulatory system to reduce air pollution nationwide. 42 U.S.C. § 7401, et seq. Under Title I of the Act, the EPA is charged with identifying air pollutants that endanger the public health and welfare. Id. §§ 7408-7409. The Act also requires the EPA to formulate national ambient air quality standards ("NAAQS"), specifying the maximum permissible air concentration of six pollutants, including a one-hour standard of 0.12 parts per million for ozone pollution. See 40 C.F.R. pt. 50.9(a).[1]

---

[1] The "one-hour" standard was established by the EPA in 1979. 40 C.F.R. § 50.9. In 1997, the EPA established an eight-hour standard for ozone in accordance with CAA § 109(d), 42 U.S.C. § 7409(d)(1). 40 C.F.R. § 50.10. However, the one-hour standard continues to apply to the Baton Rouge area. 40 C.F.R. § 50.9(b).

2

In 1990, Congress responded to the problem of widespread nonattainment of the ozone NAAQS by adding "Subpart 2," 42 U.S.C. §§ 7511-7511f, which had the purpose of imposing "carefully designed restrictions on EPA discretion." Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 484 (2001). The 1990 Amendments to the Act created a classification system designating areas of the country as "attainment" or "nonattainment," based on whether or not areas were in compliance with the permissible NAAQS for ozone. 42 U.S.C. § 7407(d). If an area fails to meet the NAAQS standards, then the EPA designates the area as one of "nonattainment." Id. Nonattainment areas are further classified according to the severity of the ozone problem as "marginal," "moderate," "serious," "severe," or "extreme." Id. § 7511(a)(1).

The 1990 Amendments also specified certain measures each nonattainment area was required to take and limited the number of years each area had to achieve compliance, ranging from 1993 to 2010, depending on an area's classification. Id. § 7511(a). Under the CAA, the following time line was established for the NAAQS to be achieved: (1) November 15, 1993, for marginal areas; (2) November 15, 1996, for moderate areas; (3) November 15, 1999, for serious areas; (4) November 15, 2005, for severe areas; (5) November 15, 2007, for severe-17 areas; and (6) November 15, 2010, for extreme areas. Id. In accord with this time line, if the EPA determines that a marginal, moderate, serious, or severe area does not attain the pertinent standard, the EPA is required, by operation of law, to reclassify the area to the next higher classification. Id. § 7511 (b) (2). The area's attainment date is then extended and the area is simultaneously subjected to the additional regulations applicable to the higher classification. Id.

Congress further required a permit program, designated the New Source Review ("NSR"), as a component of the CAA. Id. §§ 7475(a), 7502(c)(5), 7503. Under the NSR, Congress required

3

that major sources of air pollution, having the potential to emit pollutants above certain thresholds, obtain permits prior to construction or modification of the source and comply with certain requirements. Id. For NSR in nonattainment areas, these requirements include complying with the Lowest Achievable Emission Rate ("LAER") and obtaining sufficient emission reductions from existing sources to offset the source's increased emissions. Id. §§ 7502(c)(5), 7503.

The CAA also established a federal-state partnership, recognizing that prevention and control of air pollution at its source is the primary responsibility of States and local governments, and delegated to the States primary responsibility for implementing the NAAQS standards. Id. §§ 7401, 7407. In accord with this partnership, each State failing to comply with NAAQS, for any air pollutant, is required to submit a plan, known as a state implementation plan ("SIP"), specifying emission limitations applicable to pollution sources and taking additional steps to attain the relevant NAAQS. Id. § 7410(a). SIPs must be designed to bring a State into compliance and also must prohibit emissions that "contribute significantly to nonattainment in, or interfere with maintenance by, any other State." Id. § 7410(a)(2)(D)(i)(I).

In areas of ozone nonattainment, a State must submit, "as expeditiously as practicable," SIP revisions to the EPA in order to attain NAAQS compliance. Id. § 7511(a)(1). The revised SIP submission must provide an attainment demonstration to show that the area will achieve the NAAQS by the area's applicable statutory deadline, id. § 7511a(c)(2)(A), and an implementation plan for any reasonably available control measures ("RACM") that will advance the attainment date. Id. § 7502(c)(1). For areas classified as serious or severe, the States must also submit Reasonable Further Progress ("Rate of Progress") SIPs demonstrating an average reduction of baseline emissions of 3% per year. Id. § 7511a(c)(2)(B). Additionally, nonattainment area SIPs must provide for the

4

implementation of specific [contingency] measures to be undertaken if the area fails to make reasonable further progress, or to attain the NAAQS by the applicable attainment deadline. Id. § 7502(c)(9).

The SIPs, and any revisions to the SIPs, must be adopted by the State after reasonable notice and public hearing. Id. § 7410(a)(1). The EPA must then review each submitted plan. Id. § 7410(k). If the plan is approved, in whole or in part, the approved provisions become federally enforceable. Id. §§ 7413, 7604. If the plan is not approved, or is determined to be incomplete, the State may be subject to sanctions and eventually federally imposed clean air measures. Id. §§ 7410(c), 7509.

## B.    Present Facts

The EPA first designated the Baton Rouge area, which encompasses five parishes, as an ozone nonattainment area in 1978. 43 Fed. Reg. 8,964, 8,998 (March 3, 1978). In 1991, the EPA re-designated the Baton Rouge area as a "serious" ozone attainment area in accordance with the 1990 CAA amendments, with a statutory attainment deadline of November 15, 1999. 56 Fed. Reg. 56,694, 56,770 (Nov. 6, 1991). The Baton Rouge area is subject to ozone pollution from upwind sources outside the State of Louisiana, which have contributed to the failure of the Baton Rouge area to attain the ozone NAAQS. 67 Fed. Reg. 61,786, 61,790 (Oct. 2, 2002) (to be codified at 40 C.F.R. pts. 52 and 81). To this day, the Baton Rouge area has failed to attain the ozone NAAQS.

On November 22, 2000, LEAN brought a citizen suit against the Administrator for failure to perform a nondiscretionary act or duty. 42 U.S.C. § 7604(a)(2). Following the passing of the November 15, 1999, deadline, LEAN sought to ensure that the agency issue a determination as to whether the Baton Rouge area's failure to meet the statutory deadline for attaining the ozone standard required a reclassification to the next higher classification. On March 7, 2002, the district

5

court entered a judgment ordering EPA to issue a determination by June 5, 2002, as to whether the Baton Rouge area had attained the applicable ozone standard. See 68 Fed. Reg. 20,077, 20,078 (April 24, 2003).

On June 24, 2002, the EPA determined that the Baton Rouge area did not attain the ozone NAAQS by the November 15, 1999, deadline for serious ozone non-attainment areas. 67 Fed. Reg. 42,688, 42,688 (June 24, 2002). In a separate rulemaking, the EPA withdrew its determination, based on its ozone extension policy, and extended the attainment date for the Baton Rouge area to November 15, 2005, while retaining Baton Rouge's status as a serious ozone non-attainment area. Id.

On December 11, 2002, in an action concerning the Beaumont-Port Arthur, Texas ozone nonattainment area, this court rejected the EPA's ozone extension policy as inconsistent with the CAA. See Sierra Club, 314 F.3d at 741. The EPA then requested a voluntary remand of its extension policy to the Baton Rouge area, and this court granted the remand. LEAN v. EPA, No. 02-60991, order at 1 (2003). The EPA vacated its extension of the attainment date for the Baton Rouge area and reinstated its June 24, 2002, rule making action bumping the Baton Rouge area, by operation of law, to severe non-attainment status. 68 Fed. Reg. at 20,077.

Simultaneous to the EPA issuing its final rule extending the attainment date for the Baton Rouge area, the EPA also approved the State's attainment demonstration SIP for the Baton Rouge area. 67 Fed. Reg. at 61,786. In a separate rule making, the EPA approved revisions to Louisiana's non-attainment NSR procedures which, *inter alia*, included a process known as inter-precursor trading. 67 Fed. Reg. 61,260 (Sept. 30, 2002) (to be codified at 40 C.F.R. pt. 52). Under inter-precursor trading, regulated companies are allowed to trade an increase in volatile organic

6

compounds ("VOC") emissions to be offset by a decrease in Nitrogen Oxides ("NOx") emissions. Id. In yet another separate rule making, the EPA approved Louisiana's substitute contingency measures. 67 Fed. Reg. 60,590, 60,590 ( Sept. 26, 2002) (to be codified at 40 C.F.R. pt. 52).[2] The original contingency measures plan consisted of 5.7 tons per day of VOC emissions reductions "on deposit" in the State Emission Reduction Credit Bank. 67 Fed. Reg. 35,468, 35,468 (May 20, 2002). Following our decision in Sierra Club, the EPA approved a substitute contingency measures plan requiring that the Trunkline Gas Company -- Patterson Compressor Station ("Trunkline facility") in Saint Mary Parish permanently reduce its VOC emissions by 6.1 tons per day from the 1990 emission levels. Id. The Trunkline facility installed a flare, in 1998, to dispose of volatile flash gases from several storage containers in order to comply with Louisiana's waste gas disposal rule and comprehensive toxic air pollutant control program. 67 Fed. Reg. at 60,591. Because the 6.1 tons per day reduction from the Trunkline facility is greater than the 5.7 tons per day in the prior contingency measure, EPA found that this SIP revision will result in lower emissions and comply with the Act. Id. LEAN challenges the EPA's three aforementioned final rules.

DISCUSSION

I.      Mootness

The issue presented at the outset is whether we properly have jurisdiction to reach the merits of LEAN's challenges to the EPA's approval of the attainment demonstration SIP and the NSR inter-precursor trading provision.

---

[2] These contingency measures replaced the State's previous contingency measures, and are therefore referred to as "substitute" contingency measures.

It is well-settled, that mootness is a threshold jurisdictional inquiry.  See Deakins v. Monaghan, 484 U.S. 193, 199 (1988) ("Article III of the Constitution limits federal courts to the adjudication of actual, ongoing controversies between litigants.").  In general, a claim becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.  Murphy v. Hunt, 455 U.S. 478, 481 (1982) (per curiam); see Piggly Wiggly Clarksville v. Mrs Baird's Bakeries, 177 F.3d 380, 383 (5th Cir. 1999).  If a dispute has been resolved, or if it has evanesced because of changed circumstances, it is considered moot.  American Medical Assoc. v. Bowen, 857 F.2d 267 (5th Cir. 1988).  This court has long been careful to note an exception to the general principle of mootness in instances where some issues of a case have become moot "but the case as a whole remains alive because other issues have not become moot."  ITT Rayonier, Inc. v. United States, 651 F.2d 343, 345 (5th Cir. Unit B 1981); see also Aulenbach, Inc. v. FHA, 103 F.3d 156, 163 (D.C. Cir. 1997).

There can be no doubt that LEAN's request for relief concerning the attainment demonstration SIP and the interprecursor trading provisions are moot.  The EPA recognized that due to the Baton Rouge area's reclassification from a "serious" to a presently "severe" nonattainment area, the attainment demonstration SIP had to be revised in the aftermath of our Sierra Club decision. The agency's approval of the inter-precursor trading provision was also based in part on the EPA's finding that an approvable attainment demonstration existed for the Baton Rouge area.  EPA hence requested, and we granted, a voluntary vacatur of the agency's final rules approving the Baton Rouge's attainment demonstration SIP and the corollary inter-precursor trading provision.  Because there is no longer any possibility that LEAN can obtain relief for either claim, we dismiss those claims as moot, and hence resolve only the issues remaining alive.

8

II.     Substitute Contingency Measures

LEAN's sole remaining claim is that the EPA erroneously approved a substitute contingency measure, contained in Louisiana's revised SIP, which the State initiated in response to our remand in Sierra Club. The substitute contingency measure consists of a 6.1 tons per day VOC emissions reductions from the Trunkline facility in St. Mary's Parish. LEAN argues that the EPA acted arbitrarily and capriciously by approving an illegal substitute contingency measure that will not promote attainment. Because the contingency measure is prohibited, LEAN asks that we vacate revisions of the 1990 Base Year Emissions Inventory and the EPA's rescission of the prior contingency measure in favor of the substitute.

We review the EPA's interpretation of the CAA under the standards set forth in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); see also Sierra Club v. U.S. Fish and Wildlife Serv., 245 F.3d 434, 440-41 (5th Cir. 2001). The first step of the Chevron inquiry requires us to determine whether Congress has "directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. If Congress "has directly spoken to the precise question at issue," then we must "give effect to [its] unambiguously expressed intent." Id. at 842-43. Reversal is warranted only where an agency interpretation is contrary to "clear congressional intent." Id. at 843 n.9.

Step two of Chevron applies when the statute is either silent or ambiguous. Under these circumstances, the court determines whether the agency interpretation is a "permissible construction of the statute." Id. at 843. Deference is warranted where the agency's construction is permissible. Id. at 843. Consistent with § 706 of the Administrative Procedure Act ("APA"), we reverse only where the agency's construction of the statute is "arbitrary, capricious, an abuse of discretion, or

9

otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A); see also City of Abilene v. United States EPA, 325 F.3d 657, 664 (5th Cir. 2003).

We recognize that under this deferential standard, a court reviewing an agency action may not substitute its own judgment for that of the agency. City of Abilene, 325 F.3d at 664. While our deference to the agency's expertise is significant, we may not defer to an agency decision that "is without substantial basis in fact." Fed. Power Comm'n v. Florida Power & Light Co., 404 U.S. 453, 463 (1972). Our court will find an agency action arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Texas Oil & Gas Ass'n v. EPA, 161 F.3d 923, 934 (5th Cir. 1998) (citing Motor Vehicle Mfrs. Assn. v. State Farm Mut., 463 U.S. 29, 43 (1983). We therefore limit the scope of our inquiry to determining if the agency's judgment conforms to minimum standards of rationality — whether the agency action "bears a rational relationship to the statutory purposes" and is there "substantial evidence in the record to support it." Id.

LEAN posits that the EPA's approval of the substitute contingency measure is unlawful for three reasons: (1) historical reductions in emissions cannot qualify as a contingency measure; (2) emissions reductions already required by law cannot qualify as a contingency measure; and (3) reductions outside the Baton Rouge nonattainment area, without a finding that such reductions improve air quality within the Baton Rouge area, cannot qualify as a contingency measure. We address each argument in turn.

A.      Early Activated Continuing Reductions

LEAN argues that the EPA should not have approved this contingency measure because the reduction is not prospective in nature. LEAN's challenge focuses on the agency's approval of an emissions reduction at the Trunkline facility which occurred in 1998 one year prior to the Baton Rouge area missing its attainment deadline. The EPA counters by asserting that its approval of the contingency measure is a reasonable interpretation of the CAA because reductions from the Trunkline facility are continuing in nature. We find the EPA's argument more persuasive.

Section 172(c)(1) and §182(c)(9) of the Act direct that a state's revised SIP shall include "contingency measures to take effect in any such case without further action by the State or the Administrator" if an area fails to attain the NAAQS standard by the applicable date or comply with a Rate of Progress Plan deadline. 42 U.S.C. § 7511a(c)(9) (emphasis added); ("the plan revisions shall provide for the implementation of specific measures to be undertaken if the area fails to meet any applicable milestone") (emphasis added). Based on "General Preamble" guidance, the EPA interpreted the control measure requirements of § 172(c)(9) and § 182(c)(9) to intend that "[a]lthough the emissions reductions from the Trunkline facility first occurred in 1998, the reductions are continuing on an annual basis and are surplus, permanent and federally enforceable." 67 Fed. Reg. at 60,592 (citing 57 Fed. Reg. 13,498, 13, 511 (April 16, 1992) (EPA's General Preamble)).

The Act, on its face, creates an ambiguity as to the meaning of the terms "to take effect" and "to be undertaken." On one hand, a plain reading of the terms "to take effect" and "to be undertaken" imply a prospective, forward looking orientation. Such a prospective reading of the text would seemingly preclude the use of past reductions which have already failed to achieve attainment. On the other hand, although the CAA uses the present tense, the Act neither affirms nor prohibits *continuing* emissions reductions — measures which originate prior to the SIP failing, but whose

11

effects continue to manifest an effect after the plan fails — from being utilized as a contingency measure. This statutory silence presents a problem of ambiguity. See In re Dengel, 340 F.3d 300, 309 (5th Cir. 2003) ("Silence, after all, normally creates ambiguity. It does not resolve it.").

Due to the ambiguity, the EPA contends that we should defer to the agency's unpublished General Preamble, which takes the position that nonattainment areas may implement their contingency measures early, meaning reductions may be achieved before the contingency measure is triggered, as long as such measures are continuing in nature. Id. Although normally we extend such deference to an agency, the Supreme Court and this court have made clear that interpretations of statutes not arrived at by "formal adjudication or notice-and-comment rulemaking," e.g. opinion letters, "policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law — do not warrant Chevron-style deference." Christensen v. Harris County, 529 U.S. 576, 587 (2000); Henrikson v. Guzik, 249 F.3d 395, 398 (5th Cir. 2001). Although such interpretations lack the "power to control," they are entitled to respect to the extent that they have the "power to persuade." Id. (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). Because the General Preamble relied upon by the EPA contains preliminary interpretations made prior to notice-and-comment rulemaking, we cannot grant it Chevron-style deference, but we may nonetheless find the General Preamble persuasive.

Here, the EPA's allowance of early reductions to be used as contingency measures comports with a primary purpose of the CAA — the aim of ensuring that nonattainment areas reach NAAQS compliance in an efficient manner — and necessary requirements of the CAA. The EPA's early contingency plan allows areas classified moderate and above, such as the Baton Rouge area, to include sufficient contingency measures to ensure that "upon implementation of such measures,

12

additional emissions reductions of up to 3 percent of the emissions in the adjusted base year inventory (or such lesser percentage that will cure the identified failure) would be achieved in the year following the year in which the failure has been identified." 57 Fed. Reg. at 13,511 (EPA's General Preamble). By utilizing contingency measures early, the contingency measures ensured that "an appropriate level of emissions reduction progress" would be implemented while the State "adopt[ed] newly required measures resulting from the bump-up to a higher classification." Id.

Moreover, in compliance with § 172(c)(1) of the Act, early reductions are necessary in order to create an incentive for nonattainment areas to implement "all reasonably available control measures as expeditiously as practicable." 42 U.S.C. § 7502(c)(1). Hence, it seems illogical to penalize nonattainment areas that are taking extra steps, such as implementing contingency measures prior to a deadline, to comport with the CAA's mandate that such states achieve NAAQS compliance as "expeditiously as practicable."

Furthermore, we find the EPA's contention that the positive effects from the Trunkline reduction are continuing in nature equally persuasive. We note that the reductions credits from the Trunkline facility, although already implemented, are in effect set aside, "to be applied in the event that attainment is achieved" and such reduction credits "are not available for any other use." 67 Fed. Reg. at 60,592 (citing 57 Fed. Reg. at 13,511 (EPA's General Preamble)). The setting aside of a continuing, surplus emissions reduction fits neatly within the CAA's requirement that a necessary element of a contingency measure is that it must "take effect without further action by the State or [EPA]."[3] Id. Thus, although the General Preamble is not entitled to full Chevron deference, we find

---

[3] LEAN correctly contends that the EPA erred in concluding that if reductions were not used for a contingency measure, such reductions could apply toward the State's Emission Reduction Credit Bank. Under Louisiana state law, sources outside the nonattainment area are prohibited from

13

the EPA's argument persuasive, that the early activation of continuing contingency measures is consistent with the purpose and requirements of the CAA statute.

## B.     Trunkline Reduction Required By Law

LEAN next argues that the continuing Trunkline emissions reduction cannot be a valid contingency measure because the reduction is required by Louisiana state waste gas disposal regulations. According to LEAN, an emission reduction that is already required to be undertaken by law cannot be a future contingency measure, nor can it be a surplus reduction. LEAN has waived this argument because it failed to raise the challenge before the EPA during the comment period on the final rule regarding the substitute contingency measure. Public Citizen, Inc. v. EPA, 343 F.3d 449, 461 (5th Cir. 2003) ("Absent exceptional circumstances, a party cannot judicially challenge agency action on grounds not presented to the agency at the appropriate time during the administrative proceeding."). The comment period on the proposed substitute contingency measures rule closed on June 19, 2002. 67 Fed. Reg. at 35,468. While LEAN did raise the argument to the EPA in its September 3, 2002, comment letter on another EPA rulemaking, it had already missed the deadline for submitting comments on the substitute contingency measure rulemaking. Because the comment was not presented to the EPA during the approval process, we therefore conclude that this issue is not properly before us.

## C.     Reductions Outside Baton Rouge Area

_____

participating in the State's Emission Reduction Credit Bank. See La. Admin. Code 33:III.603 ("sources located in EPA-designated ozone attainment areas may not participate in the emissions banking program."). Nevertheless, at oral argument EPA pointed out, and we agree, that although the Emissions Reductions Credit Bank was a bad example, it was not a necessary condition for approval. Moreover, we find that the factual basis for EPA's decision was sound — the substitute contingency measure could not be used for any other measure.

14

LEAN also argues that the continuing Trunkline emissions reduction cannot be a valid contingency measure because the facility is outside the designated Baton Rouge nonattainment area. Specifically, LEAN contends that the EPA erroneously approved the Trunkline reductions as a contingency measure without the EPA demonstrating that the Trunkline reductions will have positive effects in the Baton Rouge nonattainment area. We agree.

The Baton Rouge nonattainment area consists of five surrounding parishes — Ascension, East Baton Rouge, Iberville, Livingston, and West Baton Rouge. 67 Fed. Reg. at 71,787. To the north of the Baton Rouge area are four parishes — East Feliciana, Pointe Coupee, St. Helena, and West Feliciana — that have attained all NAAQS standards, but nevertheless, have been identified as parishes influencing the Baton Rouge area's ozone nonattainment matter. La. Admin. Code 33:III.2201.B. The Trunkline facility is not located within any one of the parishes comprising the Baton Rouge nonattainment area, nor is the Trunkline reduction located in one of the "ozone influence" parishes. Instead, the Trunkline facility is positioned in St. Mary Parish, south of St. Martin and Iberia Parishes, approximately 40 kilometers from the Baton Rouge nonattainment area. 40 C.F.R. § 81.319 (2003).

The EPA attempts to justify its approval of the Trunkline emissions reduction as a reasonable interpretation consistent with the CAA. The EPA argues that by approving the Trunkline contingency measure, the agency "has proposed approval of an adjustment of Louisiana's 1990 baseline to include the Trunkline emissions. Once these emissions are included in the baseline . . . reducing them will lower emissions in the [Baton Rouge] area on a continuing basis." 67 Fed. Reg. at 60,592. In other words, according to the EPA, it could only approve Louisiana's use of "credit

15

from outside a nonattainment area" as a contingency measure "provided that such emissions are included in the baseline." Id.

In addressing the EPA's contention we return to the Chevron doctrine, and look first to the text of the CAA. Under the Act, "baseline emissions" are defined as "the total amount of actual VOC . . . emissions from all anthropogenic sources in the area during the calendar year 1990." 42 U.S.C. § 7511a(b)(1)(B) (emphasis added). The Act does not define the term "in the area." On the one hand, the meaning of "in the area" could be limited to emissions within the nonattainment area. On the other hand, the CAA does not expressly state that emissions outside the nonattainment area are prohibited, rather the Act only states that emissions from sources "in the area" must be included. We therefore find the CAA ambiguous on this point.

Moving to step two of Chevron, we must ascertain whether the agency's interpretation is reasonable. LEAN urges us to consider that the EPA's own interpretation of the Act limits baseline emissions to the designated nonattainment area. In the agency's General Preamble, the EPA explained that "baseline emissions are defined to be all emissions 'in the area,' which EPA interprets to mean in the designated nonattainment area." 57 Fed. Reg. 13,498 13,517 (April 16, 1992) (emphasis added). The General Preamble, however, represents only the EPA's "preliminary interpretations" and it expressly stated that the EPA would take further action, id., and with a later un-promulgated 1997 policy guidance the EPA made good on its promise. In addressing whether the EPA's baseline argument is a reasonable interpretation of the CAA, we must turn to analyzing the 1997 policy.

Under the un-promulgated 1997 policy guidance, States are allowed to "take credit for emissions reductions obtained from sources outside the designated nonattainment area" to be used

to meet its "annual Rate of Progress emissions reductions," if "the sources are no farther away than100km . . . away from the nonattainment area." 67 Fed. Reg at 60,591; 67 Fed. Reg. at 60,795. The crux of the EPA's contention therefore is that because the Trunkline facility's location is merely 40 kilometers away from the Baton Rouge nonattainment area, the use of the Trunkline facility as a contingency measure falls well within the 1997 policy. As we previously stated, an agency's un-promulgated policy statement does not warrant full Chevron-style deference, instead it merely has the "power to persuade." Christensen, 529 U.S. at 587; Henrikson, 249 F.3d at 398.

The un-promulgated 1997 policy has no such persuasive appeal. The EPA's 1997 policy focuses solely on distance — i.e., the Trunkline facility is 40 kilometers from Baton Rouge — but we find no mention of an inquiry into geographical location — i.e., a demonstration that pollution reductions at the Trunkline facility in St. Mary Parish would effectively promote ozone attainment in the Baton Rouge area.[4] Quite the contrary, while the Trunkline facility is located more than 24 miles to the south of the nonattainment area, the State identified four attainment parishes to the north which influence attainment in the Baton Rouge area. Moreover, the 1997 policy expressly applies to "reasonable further progress" demonstrations, which were not at issue in this approval. Hence, the EPA does not persuasively demonstrate that the 1997 policy has any rational connection with the relevant issue of what contingency measures to apply when an attainment deadline passes.

---

[4] We similarly reject the EPA's argument that because Houston, Texas, which is hundreds of miles away, has been found to impact the Baton Rouge area, it is reasonable that St. Mary's Parish which is closer to Baton Rouge could also impact the Baton Rouge nonattainment area. Again, we emphasize that while this argument emphasizes distance, it fails to address whether the EPA found that the Trunkline facility's location to the south of the Baton Rouge area may nonetheless have positive effects on the northern Baton Rouge nonattainment area.

Undeterred, the EPA contends that its baseline interpretation of the CAA was reasonable based on general modeling analysis. The EPA contends that the overall modeling analysis shows that sources in attainment areas, including the Trunkline facility, impact the Baton Rouge nonattainment area. 67 Fed. Reg. at 61,795. Applying Chevron-style deference, we nevertheless find that the EPA has failed to exhibit substantial evidence to support its modeling analysis. A review of the administrative record shows that the EPA's modeling analysis clearly demonstrates that reductions from parishes outside the nonattainment area, "within Grid D," can affect emissions reductions in the Baton Rouge nonattainment area. The EPA fails to mention or show any evidence, however, that either St. Mary Parish as a whole, or parts of St. Mary Parish, which includes the Trunkline facility, is included within Grid D. Without such a finding, this court cannot grant the EPA Chevron deference because we are left only with the naked assertion that reductions from the Trunkline facility will reasonably aid the Baton Rouge area in its quest for attainment.

In sum, we find no record support to demonstrate that reductions outside the Baton Rouge area can qualify as a contingency measure. Because the record fails to support the agency's decision, we remand to the EPA for additional investigation or explanation. See Florida Power, 470 U.S. at 744 (stating that if an agency decision cannot be affirmed on the basis of the administrative record, then "the matter [should be] remanded to [the agency] for further consideration"). We therefore reject LEAN's request to order the EPA to reinstate Louisiana's previous contingency measure and we reject LEAN's request to vacate revisions of the 1990 Base Year Emissions Inventory.

CONCLUSION

For the aforementioned reasons, we DENY that part of LEAN's petition challenging the EPA's approval of the State's attainment demonstration and inter-precursor trading. We GRANT

18

LEAN's petition that the EPA's approval of the contingency measure lacked record support, and

VACATE and REMAND for further proceedings consistent with this opinion.